IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LATOYA HARDNEY, INDIVIDUALLY
AND AS ADMINISTRATOR OF THE
ESTATE OF KENNETH T. SHARP,
DECEASED,

        Plaintiff,

v.                                Civil Action No. 3:25-cv-24

CITY OF RICHMOND, *et al.*,

        Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant City of Richmond's (the "City") Motion to Dismiss (the "Motion to Dismiss" or "Motion").[1] (ECF No. 9.) Plaintiff Latyoa Hardney, in her individual capacity and as administrator of the estate of Kenneth Sharp, responded in opposition to the Motion, (ECF No. 11), and the City replied, (ECF No. 12).

The matter is ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid in the decisional process.

For the reasons articulated below, the Court will grant the City's Motion to Dismiss. (ECF No. 9.)

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system.

## I. Factual and Procedural Background

### A.  Factual Background[2]

#### 1.  Officer Hall's Interactions with Mr. Sharp

On March 31, 2024, "at around 5:00 a.m.," Defendant Todd Hall ("Officer Hall"), an officer of the Richmond Police Department, "responded to Cedar Street in Richmond, Virginia regarding reports of a person in a car." (ECF No. 1 ¶¶ 7, 16.)  Officer Hall was accompanied by five other officers of the Richmond Police Department ("Doe Officers 1–5").[3]  (ECF No. 1 ¶ 16.) Officer Hall "walked up [to] the vehicle" and saw Kenneth Sharp "sleeping in the reported vehicle." (ECF No. 1 ¶ 16.)  Mr. Sharp "did not pose a threat to himself or anyone else." (ECF No. 1 ¶ 16.)

Officer Hall "walked back to his police cruiser," spoke with Doe Officer 1, then approached the vehicle Mr. Sharp slept in again. (ECF No. 1 ¶ 17.)  Officer Hall had "no police lights on his cruiser [and] no siren." (ECF No. 1 ¶ 17.)  "[W]ithout identifying himself as a police officer," Officer Hall "knocked on the passenger door [of Mr. Sharp's car] while shining a flashlight directly into the car." (ECF No. 1 ¶ 17.)

---

[2] In considering the Motion to Dismiss, the Court will assume the well-pleaded factual allegations in the Complaint to be true and will view them in the light most favorable to Ms. Hardney. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

[3] Ms. Hardney's Complaint includes counts against ten unnamed officers of the Richmond Police Department.  These unnamed officers have not yet been served.  Several of the Counts included in the Complaint contain allegations directed only at the first five of these Defendants, to whom the Court refers as "Doe Officers 1–5."  Other Counts included in the Complaint contain allegations directed only at the remaining five unnamed officers, to whom the Court refers as "Doe Officers 1–6."

2

Mr. Sharp "opened the [car] door," and Officer Hall "saw a long gun." (ECF No. 1 ¶ 18.) Officer Hall "ran to his police cruiser, turned around, and shot [Mr. Sharp], killing him." (ECF No. 1 ¶ 18.) Officer Hall and the other accompanying officers "failed to provide a warning that they were prepared to use lethal force prior to their use of lethal force, despite it being feasible to do so." (ECF No. 1 ¶ 21.) Officer Hall and the other accompanying officers "had non-lethal weapons but chose not to use them; instead, they immediately escalated to lethal force." (ECF No. 1 ¶ 22.)

Mr. Sharp "did not pose an immediate threat of death or serious bodily injury," and he "never raised, attempted to raise, or pointed the rifle" at any of the officers present. (ECF No. 1 ¶ 19.) Mr. Sharp "never made verbal threats toward" any of the officers present "or anyone else prior to or during the shooting." (ECF No. 1 ¶ 19.)

Mr. Sharp "sustained several gunshot wounds to his body and died as a result of his gunshot wounds." (ECF No. 1 ¶ 24.) "Despite having knowledge that [Mr. Sharp] was seriously injured," the officers present "failed to timely summon medical care or permit medical personnel to treat [Mr. Sharp]." (ECF No. 1 ¶ 23.) The "delay of medical care" was a "contributing cause" to Mr. Sharp's injuries. (ECF No. 1 ¶ 23.) The officers "knew that failure to provide timely medical treatment . . . could result in further significant injury . . . but disregarded that serious medical need." (ECF No. 1 ¶ 38.)

### 2. The City of Richmond's Training of and Policymaking with Respect to its Police Officers

Ms. Hardney alleges that the City "failed to adequately train [the officers] with respect to detentions and arrests, tactics, use of less-lethal options, and the use of deadly force, including determining whether the use of deadly force is reasonable and appropriate under the circumstances." (ECF No. 1 ¶ 55.) "The training policies of [the City] were not adequate to

train its officers to handle the usual and recurring situations with which they must deal." (ECF No. 1 ¶ 54.) "The failure of [the City] to provide adequate training caused the deprivation of [Mr. Sharp's] rights by [the officers]." (ECF No. 1 ¶ 56.)

When the officers "shot and killed [Mr. Sharp], and denied him timely medical attention, they acted pursuant to an expressly adopted official policy/ies or a longstanding practice(s) or custom of the [City]." (ECF No. 1 ¶ 62.) The officers "were not disciplined, reprimanded, retrained, suspended, or otherwise penalized in connection with [their] use of lethal force against" Mr. Sharp. (ECF No. 1 ¶ 63.) The City, "together with other [City] policymakers and supervisors, maintained, inter alia, the following unconstitutional customs practices, and polices," (ECF No. 1 ¶ 64):

(a) Using excessive force, including excessive deadly force;

(b) Providing inadequate training regarding the use of deadly force;

(c) Employing and retaining as officers individuals whom [the City] at all times material herein knew or reasonably should have known had dangerous propensities for abusing their authority and for using excessive force;

(d) Inadequately supervising, training, controlling, assigning, and disciplining [City] police officers, and other personnel, whom [the City] knew or in the exercise of reasonable care should have known had the aforementioned propensities and character traits;

(e) Maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining and controlling misconduct by [City] police officers;

(f) Failing to adequately discipline [City] police officers for the above-referenced categories of misconduct, including "slaps on the wrist," discipline that is so slight as to be out of proportion to the magnitude of the misconduct, and other inadequate discipline that is tantamount to encouraging misconduct;

(g) Announcing that unjustified shootings are "within policy," including shootings that were later determined in court to be unconstitutional;

4

(h) Even where shootings are determined in court to be unconstitutional, refusing to discipline, terminate, or retrain the officers involved;

(i) Encouraging, accommodating, or facilitating a "blue code of silence," "blue shield," "blue wall," "blue curtain," "blue veil," or simply "code of silence," pursuant to which police officers do not report other officers' errors, misconduct, or crimes. Pursuant to this code of silence, if questioned about an incident of misconduct involving another officer, while following the code, the officer being questioned will claim ignorance of the other officers' wrongdoing; [and]

(j) Maintaining a policy of inaction and an attitude of indifference towards soaring numbers of police shootings, including by failing to discipline, retrain, investigate, terminate, and recommend officers for criminal prosecution who participate in shootings of unarmed people.

(ECF No. 1 ¶ 64.) The City, "together with various other officials . . . had either actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above." (ECF No. 1 ¶ 65.) The City "acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of" Mr. Sharp. (ECF No. 1 ¶ 65.)

### B.    Procedural History

On January 15, 2025, Ms. Hardney, Mr. Sharp's mother and the administrator of his estate, filed a Complaint against the City, Officer Hall, and ten unnamed officers. (ECF No. 1.) The Complaint contains seven Counts:

| | |
|---|---|
| Count I: | 42 U.S.C. § 1983, Unreasonable Search and Seizure, Excessive Force in violation of the Fourth Amendment, against Defendants Todd Hall and Doe Officers 1–5. |
| Count II: | 42 U.S.C. § 1983, Unreasonable Search and Seizure, Denial of Medical Care in violation of the Fourth Amendment, against Defendants Todd Hall and Doe Officers 1–5. |
| Count III: | 42 U.S.C. § 1983, Municipal Liability, Ratification, against Defendants City of Richmond and Doe Officers 6–10. |
| Count IV: | 42 U.S.C. § 1983, Municipal Liability, Failure to Train, against Defendants City of Richmond and Doe Officers 6–10. |

5

Count V:    42 U.S.C. § 1983, Municipal Liability, Unconstitutional Custom or Policy, against Defendants City of Richmond and Doe Officers 6–10.

Count VI:    Battery, against Defendants City of Richmond and Todd Hall.

Count VII:    Negligence, against all Defendants.

(ECF No. 1 ¶¶ 25–80.) On March 18, 2025, the City filed the instant Motion to Dismiss. In the Motion, the City asks the Court to dismiss Ms. Hardney's claims against it in Counts III through VII. On April 1, 2025, Ms. Hardney responded to the Motion to Dismiss. (ECF No. 11.) In her response, Ms. Hardney "agrees to dismiss without prejudice [Counts] III, VI, and VII" against the City. (ECF No. 11, at 2 & n.1.) On April 7, 2025, the City replied to Ms. Hardney's response. (ECF No. 12.) Because Ms. Hardney will dismiss Counts III, VI, and VII as alleged against the City, the Court will consider only the City's argument that the Court should dismiss Counts IV and V as alleged against the City.

For the reasons articulated below, the Court will grant the Motion to Dismiss.

## II. Standard of Review

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). Mere labels and conclusions declaring that the plaintiff is entitled to relief

6

are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193 (citation omitted). The court must assume all well-pleaded factual allegations to be true and determine whether, when viewed in the light most favorable to the plaintiff, these allegations "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *see also Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (concluding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011))).

A motion to dismiss pursuant to Rule 12(b)(6) must be read in conjunction with Rule 8(a)(2). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so as to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Fair notice is provided by setting forth enough facts for the complaint to be "plausible on its face" and "raise a right to relief above the speculative

7

level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555, 570 (citations omitted).

### III.  Analysis

The City argues that Ms. Hardney has failed to state a claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  The City contends that Ms. Hardney fails to establish either a failure-to-train theory or a custom-or-practice theory under *Monell*.  Ms. Hardney responds that she has sufficiently stated a claim with respect to both theories.  Specifically, Ms. Hardney argues that (1) the Complaint contains sufficient facts that, taken as true, demonstrate that the City's failure to train its officers constituted deliberate indifference; and (2) the Complaint contains sufficient facts that, taken as true, demonstrate that the City maintained a custom or practice of engaging in a variety of constitutional violations.

For the reasons articulated below, the Court will grant the Motion to Dismiss.  Ms. Hardney neither pleads sufficient facts to support a failure-to-train theory nor a custom-or-practice theory under *Monell*.

### A.      Ms. Hardney Fails to Adequately Plead a § 1983 Claim Against the City

#### 1.      Legal Standard:  *Monell* Liability

"For purposes of Section 1983, a municipality is considered a 'person' and thus is subject to suit." *Hunter v. Town of Mocksville*, 897 F.3d 538, 553 (4th Cir. 2018) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)).  Although an underlying constitutional violation is a *necessary* element of municipal liability, it is not *sufficient*:  "'a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.'"  *Id.* at 553–54 (quoting *Monell*, 436 U.S. at 691).  Instead, liability will arise only "'when execution of a [municipality's] policy or

8

custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the [municipality] as an entity is responsible [for] under § 1983.'" *Id.* at 554 (quoting *Monell*, 436 U.S. at 694). "'[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.'" *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)).

The United States Court of Appeals for the Fourth Circuit has identified four avenues through which a § 1983 plaintiff may demonstrate municipal liability for a policy or custom:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens;" or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (alteration in original) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)). The Complaint attempts to establish *Monell* liability against the City under the third and fourth avenues: deliberate indifference through failure to adequately train agents, and improper custom.[4]  (ECF No. 1 ¶¶ 51–69.)

### a.    <u>Deliberate Indifference Due to the Failure to Train</u>

A municipality's failure to train may support § 1983 liability where the failure "amounts to deliberate indifference," and is the "moving force [behind] the constitutional violation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89 (1989) (internal quotations omitted). This

---

[4] Ms. Hardney claims the officers acted pursuant to "an expressly adopted official policy/ies or a longstanding practice(s) or custom of" the City. (ECF No. 1 ¶ 62.) While Ms. Hardney uses the phrase "expressly adopted policy," she does not allege the existence of an "express policy, such as a written ordinance or regulation." *See Lytle*, 326 F.3d at 471. As a result, the Court declines to analyze this claim under the first avenue of demonstrating municipal liability: express policy.

municipal liability theory thus has two components in addition to an underlying constitutional violation:  deliberate indifference and causation.

To amount to "deliberate indifference," a failure to train must reflect the municipality's "deliberate" or "conscious" choice.  *Id.* at 388.  A "deliberate" choice requires that the municipality have "fair *notice* that subordinates are engaged in constitutional or statutory deprivations," and regardless "consciously chose[] a particular course of action in response." *Brown v. Mitchell*, 308 F. Supp. 2d 682, 703 (E.D. Va. 2004).  Plaintiffs may establish deliberate indifference in two ways.  First, they may show that "'policymakers were aware of, and acquiesced in, a pattern of constitutional violations.'"  *Moody v. City of Newport News*, 93 F. Supp. 3d 516, 538 (E.D. Va. 2013) (quoting *Gallimore v. Henrico Cnty. Sch. Bd.*, 38 F. Supp. 3d 721, 726 (E.D. Va. 2014)).  Second, they may demonstrate that the municipality has failed to train its employees on "'an obvious constitutional duty that particular employees are certain to face.'"  *Id.* at 538 (quoting *Gallimore*, 38 F. Supp. 3d 726).  This second method is limited, however, to a "narrow scope" of constitutional duties.  *Tobey v. Napolitano*, 808 F. Supp. 2d 830, 843 (E.D. Va. 2011).

A plaintiff must also demonstrate a "causal nexus" between the deficient training and the alleged constitutional violation.  *Brown*, 308 F. Supp. 2d at 694.  Generally, a plaintiff cannot demonstrate a causal connection "by proof of a single incident of unconstitutional activity alone."  *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 341 (4th Cir. 1994).  Rather, a plaintiff must show that the "deficiency in training actually caused" the violation.  *Canton*, 489 U.S. 378, 391.  However, in limited cases, a single incident can constitute support for a causal connection where the constitutional duty is so obvious that without proper training, "the specific violation [was] 'almost bound to happen, sooner or later.'"  *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th

10

Cir. 1987) (quoting *Patzner v. Burkett*, 779 F.2d 1363, 1367 (8th Cir. 1985)). The "paradigmatic example of an obvious constitutional duty that particular employees are certain to face is that of a police officer's duty concerning the use of deadly force." *Moody*, 93 F. Supp. 3d at 539 (quotation omitted).

### b.    Deliberate Indifference Under a Custom or Practice

Plaintiffs may also sue municipalities for constitutional deprivations "pursuant to governmental 'custom,' even though such a custom has not received formal approval through the body's official decision[-]making channels." *Monell*, 436 U.S. at 690. To determine whether a practice is persistent enough to constitute a custom with the force of law, a plaintiff must demonstrate that the "duration and frequency" of the practice "indicate[s] that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" *Owens v. Balt. City State Atty's Off.*, 767 F.3d 379, 402 (4th Cir. 2014) (internal citations omitted). Finally, the plaintiff must identify "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Canton*, 489 U.S. at 385.

### 2.    Count IV:
### Ms. Hardney Insufficiently Alleges a Failure to Train

The Complaint fails to set forth sufficient facts to establish *Monell* liability pursuant to a failure to train theory. Applying the third route to *Monell* liability discussed above, Ms. Hardney states that "[t]he training policies of [the City] were not adequate to train its officers to handle the usual and recurring situations with which they must deal." (ECF No. 1 ¶ 54.) The City "failed to adequately train" Officer Hall and Doe Officers 1–5 "with respect to detentions and arrests, tactics, use of less-lethal options, and the use of deadly force, including determining whether the use of deadly force is reasonable and appropriate under the circumstances." (ECF

11

No. 1 ¶ 55.)  As a result, the City "was deliberately indifferent to the obvious consequences of its failure to train its police officers adequately."[5]  (ECF No. 1 ¶ 55.).

Ms. Hardney asserts that she has adequately pleaded a failure-to-train theory under *Monell* because these allegations "go beyond a bare assertion of 'failure to train.'  She cites specific topics (use of force, less-lethal options, dealing with arrests and detentions) and specifically alleges the City's training on those was inadequate."  (ECF No. 11, at 8 (citing ECF No. 1 ¶¶ 54–56).)  To be sure, Ms. Hardney alleges that the City failed to train the officers on more than one subject.  But that allegation alone is not sufficient to plead a failure-to-train *Monell* theory.  Rather, as described above, Ms. Hardney may establish a claim of failure to train under *Monell* by showing that (1) policymakers were aware of, and acquiesced in, a pattern of constitutional violations, or (2) that the municipality has failed to train its employees on an obvious constitutional duty that particular employees are certain to face.  She has made neither showing.

      **a.**     **Ms. Hardney Fails to Plead a Pattern of Constitutional Violations that Would have Placed the City on Notice of its Failure to Train its Officers**

First, Ms. Hardney has not pleaded a pattern of constitutional violations by the City's officers.  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S.

---

[5] Regarding the failure to train, Ms. Hardney concentrates—almost entirely—on the failure of the City to train its officers regarding the use of deadly force.  She rarely mentions the failure to train regarding the need to avoid delay in medical care.  To the extent the Court must make a finding, it concludes that Ms. Hardney has left the allegations woefully inadequate to plausibly state a claim of failure to train in the avoidance of delayed medical care.

397, 409 (1997)). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* Ms. Hardney asserts that she "has . . . alleged deliberate indifference based on prior incidents showing that City officials knew or should have known better training was needed. Similar shootings had occurred, and the City routinely labeled them within policy regardless of legality." (ECF No. 11, at 8 n.3.)

Ms. Hardney does not cite any paragraph of the Complaint to support this characterization of her failure-to-train claim. The Complaint contains only conclusory allegations that the City adheres to "unconstitutional customs, practices, and polices," including "[a]nnouncing that unjustified shootings are 'within policy,' including shootings that were later determined in court to be unconstitutional"; "refusing to discipline, terminate, or retrain . . . officers" even where "shootings [involving an officer] are determined in court to be unconstitutional"; and "[m]aintaining a policy of inaction and an attitude of indifference towards soaring numbers of police shootings."[6] (ECF No. 1 ¶ 64.) She also contends that the City failed to adequately "investigat[e], review[], disciplin[e] and contro[l] misconduct by C[ity] police officers," and that the City disciplined its officers through mere "slaps on the wrist." (ECF No. 1 ¶ 64.). Not one "similar" incident is specified.

Even at the Motion to Dismiss stage, these conclusory allegations do not establish a "pattern of similar constitutional violations." *Connick*, 563 U.S. at 62. When plaintiffs allege that a municipality has failed to train its officers and support that allegation by pointing to a pattern of constitutional violations, courts tend to look for *specific incidents* that would put the

---

[6] While not dispositive, the Court notes that these allegations appear under Count V of the Complaint, which alleges a separate *Monell* liability theory apart from failure to train. These allegations do not appear under Count IV, the failure to train Count.

municipality on notice of these violations. *See Connick*, 563 U.S. at 62–63 (finding no pattern of violations where plaintiff failed to allege that incidents similar to those at issue in plaintiff's complaint had occurred); *Jackson v. Town of Farmville*, No. 3:22-cv-729 (MHL), 2023 WL 3871697, at *8 (E.D. Va. June 7, 2023) ("Jackson's Complaint includes allegations regarding a single December 2020 incident[.] . . . But Jackson's allegations from that interaction fall short of establishing a pattern of excessive force."); *Craven v. Novelli*, 661 F. Supp. 3d 430, 452 (W.D.N.C. 2023) ("[T]he Town argues that there is no evidence that it was on 'notice' that its training of police officers . . . was inadequate. The Court agrees."); *Brown v. City of Lynchburg*, No. 6:23-cv-54, 2024 WL 2724191, at *8 (W.D. Va. May 28, 2024) ("Plaintiffs rely on the fifteen prior use-of-force incidents to support their failure to train claims, but these diverse occurrences over a twenty-year period cannot save Plaintiffs' over-general allegation as to training deficiency."); *Moody*, 93 F. Supp. 3d at 539 (finding that even when plaintiff alleged a single specific shooting predating the allegations of the complaint, plaintiff still failed to demonstrate a *pattern* of similar shootings). Because the Complaint fails to allege a pattern of constitutional violations such that the City would have been on notice of this pattern of violations, Ms. Hardney's failure-to-train claim founders.

> **b.      Ms. Hardney Fails to Plead that the City Failed to Train its Officers on an Obvious Constitutional Duty**

Ms. Hardney asserts that "[t]he City's failure to train its officers on how to safely and constitutionally approach, detain, or arrest . . . armed individuals amounts to a failure to prepare them for a recurring and foreseeable scenario[.] . . . The need for better training in this area is obvious." (ECF No. 11, at 7.) The United States Supreme Court has "left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference" under a failure-to-train theory. *Connick*, 563 U.S. at 63 (quoting

14

*Bryan Cnty.*, 520 U.S. at 409). The Supreme Court has recognized that "the unconstitutional consequences of failing to train could be *so patently obvious* that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64 (emphasis added). Training as to the use of deadly force[7] is the archetype as so obviously requiring training.

The Supreme Court first recognized this possibility in *City of Canton, Ohio v. Harris*, which considered a hypothetical:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that *failure to do so* could properly be characterized as "deliberate indifference" to constitutional rights.

*Canton*, 489 U.S. at 390 n.10 (emphasis added). Ms. Hardney argues that this hypothetical is "directly on point." (ECF No. 11, at 7.) Taken alone, it seems that the *Canton* court's hypothetical contemplates a municipality's failure to train officers entirely. This Complaint instead alleges instead the City's failure "to *adequately* train" its officers. (ECF No. 1 ¶ 55 (emphasis added).) That is, Ms. Hardney's Complaint does not allege that the City has failed to train its officers "with respect to detentions and arrests, tactics, use of less-lethal options, and the use of deadly force," (ECF No. 1 ¶ 55), but rather that its officers received *deficient* training on these subjects.

This distinction can be meaningful. For example, in *Moody v. City of Newport News*, the plaintiff "allege[d] that the police officers that participate in arrests require special training because of the obvious risk . . . yet, the City ha[d] not provided them with such specialized

---

[7] Plaintiffs in other failure-to-train cases infrequently assert a similar "obviousness" theory with respect to municipalities' lack of training for their officers on the effects of delayed medical care.

15

training." 93 F. Supp. 3d 516, 539–40 (E.D. Va. 2015). The *Moody* court determined that "[i]n light of the Supreme Court's statement in *Canton* about the obvious need to train armed officers tasked with arresting fleeing felons, for the purposes of surviving this motion to dismiss, Plaintiff . . . alleged a sufficient factual basis to satisfy the deliberate indifference element of a failure-to-train claim" because the officers did not receive specialized training in the use of deadly force. *Id.* at 540. Ms. Hardney has not pleaded the same failure to train the City's officers with any degree of specificity.[8] As a result, she cannot support a failure-to-train theory under *Monell*.

Ms. Hardney characterizes the City as arguing "that it is not enough to allege inadequate training, but that training must be non-existent; however, the Supreme Court's own description of this cause of action specifically explains that the issue is 'whether that training program is adequate.'" (ECF No. 11, at 8 (citing *Canton*, 489 U.S. at 390).)

---

[8] Ms. Hardney contends that "at the pleading stage, a plaintiff cannot be expected to already know the internal training protocols of a police department before discovery. It is enough that Plaintiff has alleged the end result (officers engaging unconstitutional conduct) and a plausible link to a failure in training on the topics relevant to that result." (ECF No. 11, at 7–8.)

Ms. Hardney does not cite a case for this proposition, but the Court observes that the United States District Court for the District of Maryland's decision in *Washington v. Baltimore Police Department* adds helpful context. 457 F. Supp. 3d 520 (D. Md. 2020). There, the district court explained that when a plaintiff makes a failure-to-train claim, "it is important to note that, oftentimes, a plaintiff lacks specific details regarding the municipal actor's internal policies and training procedures before discovery." *Id.* at 533 (quotation omitted). But even with that knowledge in mind, the *Washington* court found that the plaintiff survived a motion to dismiss because they "supplemented [their] allegation[s] with specific examples . . . demonstrating the results of th[e] failure to train." *Id.* That is, while the district court acknowledged the same difficulty raised by Ms. Hardney, the plaintiff survived a motion to dismiss by adding in *specifics* concerning the effects of the failure to train. Ms. Hardney's Complaint does not contain the same details.

16

Ms. Hardney correctly quotes the Supreme Court, but she omits the second half of the Supreme Court's "description of this cause action." In *Canton*, the Supreme Court explained that "[t]he issue in a [failure to train] case . . . is whether that training program is adequate; *and if it is not, the question becomes whether such inadequate training can justifiably be said to represent 'city policy.'*" *Canton*, 409 U.S. at 390 (emphasis added). That is, while the Supreme Court has made clear that the adequacy of a municipality's training programs is necessarily at issue when a plaintiff alleges a failure-to-train theory, the Supreme Court has made equally clear that even upon alleging inadequate training, a plaintiff must tie that training with sufficient specificity to the municipality to raise an inference of liability against the municipality. Indeed, the "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Id.* at 385.

And the Supreme Court has made clear what a plaintiff in these circumstances must plead to establish *Monell* liability: the plaintiff must plead either (1) a pattern of violations surrounding the failure to train or (2) consequences from that failure to train that obviously lead to constitutional violations. *Connick*, 563 U.S. at 63–64. Even when the Court assumes that Ms. Hardney has adequately alleged that the City's training of its officers is deficient, the Complaint does not contain sufficient plausible allegations tying that deficiency to the City; it neither establishes a pattern of violations nor consequences from a failure to train that place the City on sufficient notice. Ms. Hardney's failure to train theory must therefore fail.

        c.     **Ms. Hardney's Conclusory Allegations Fail to Support her Failure-to-Train Theory**

At bottom, the allegations in the Complaint "constitute the same type of legal conclusions that other courts within this district have already held cannot survive a motion to dismiss." *Wynn*

*v. City of Richmond*, No. 3:21-cv-530 (MHL), 2022 WL 2318497, at *12 (E.D. Va. June 28, 2022). For example, in *Lee v. City of Richmond*, the plaintiff asserted *Monell* failure-to-train theory concerning the City's alleged failure to train its police officers because "(1) the training was inadequate; (2) the inadequate training constitute[d] deliberate indifference; and (3) the "risk of constitutional injury as a result of such deliberate indifference . . . [was] very obvious." No. 3:12-cv-471 (REP), 2013 WL 1155590, at *7 (E.D. Va. Mar. 19, 2013) (internal citations and quotations omitted). The *Lee* court determined that these allegations were "the exact type of 'labels and conclusions and a formulaic recitation of the elements of a cause of action' that *Twombly* says 'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

So too here. Like the plaintiff in *Lee*, Ms. Hardney asserts that the City's training policies "were not adequate," that the City "failed to adequately train" the officers, and that the City therefore demonstrated deliberate indifference. (ECF No. 1 ¶¶ 54–55.) These allegations "merely recit[e] the theory's elements," which would ultimately "expose the City to *respondeat superior* liability, which has been explicitly foreclosed by *Monell*." *Thornton v. Piedmont Regional Jail Authority*, No. 3:24-cv-499 (MHL), 2025 WL 888417, at *10 (E.D. Va. Mar. 21, 2025) (quoting *Lee*, 2013 WL 1155590, at *7). Ms. Hardney's allegations amount to a recitation of the elements of the claim.

Ms. Hardney therefore does not allege sufficient facts to plausibly state a claim to establish *Monell* liability based on a failure to train theory. Accordingly, the Court will dismiss Count IV against the City.

18

3. **Count V:**
   **Ms. Hardney Insufficiently Alleges an Improper Policy or Custom**

Likewise, the Complaint fails to adequately allege that the City embraced a policy or custom of engaging in the constitutional violations asserted here. Applying the fourth route to *Monell* liability discussed above, Ms. Hardney claims that the City had or condoned a "policy" and "custom" of:

(a) Using excessive force, including excessive deadly force;

(b) Providing inadequate training regarding the use of deadly force;

(c) Employing and retaining as officers individuals whom [the City] at all times material herein knew or reasonably should have known had dangerous propensities for abusing their authority and for using excessive force;

(d) Inadequately supervising, training, controlling, assigning, and disciplining [City] police officers, and other personnel, whom [the City] knew or in the exercise of reasonable care should have known had the aforementioned propensities and character traits;

(e) Maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining and controlling misconduct by [City] police officers;

(f) Failing to adequately discipline [City] police officers for the above-referenced categories of misconduct, including "slaps on the wrist," discipline that is so slight as to be out of proportion to the magnitude of the misconduct, and other inadequate discipline that is tantamount to encouraging misconduct;

(g) Announcing that unjustified shootings are "within policy," including shootings that were later determined in court to be unconstitutional;

(h) Even where shootings are determined in court to be unconstitutional, refusing to discipline, terminate, or retrain the officers involved;

(i) Encouraging, accommodating, or facilitating a "blue code of silence," "blue shield," "blue wall," "blue curtain," "blue veil," or simply "code of silence," pursuant to which police officers do not report other officers' errors, misconduct, or crimes. Pursuant to this code of silence, if questioned about an incident of misconduct involving another officer, while following the code, the officer being questioned will claim ignorance of the other officers' wrongdoing; [and]

19

(j) Maintaining a policy of inaction and an attitude of indifference towards soaring numbers of police shootings, including by failing to discipline, retrain, investigate, terminate, and recommend officers for criminal prosecution who participate in shootings of unarmed people.

(ECF No. 1 ¶ 64.)

Ms. Hardney's contention that these "policies" consist of a "custom" maintained by the City rests on labels and conclusions. The Fourth Circuit's decision in *Owens v. Baltimore City State's Attorney's Office* is instructive on this point. 767 F.3d 379 (4th Cir. 2014). In *Owens*, the defendant alleged that the Baltimore City Police Department ("BCPD") violated his constitutional rights by intentionally withholding exculpatory evidence resulting in his wrongful conviction, for which he served over twenty years in prison. *Id.* at 385, 387. Owens alleged that this withholding resulted from a "'custom, policy, and/or practice' of [BCPD] condoning its officers' conduct in 'knowingly, consciously, and repeatedly with[holding] and suppress[ing]' exculpatory evidence." *Id.* at 402 (second and third alterations in original). Crucially, the Fourth Circuit found that Owens' allegation that BCPD had "reported and unreported cases . . . of knowingly and repeatedly suppressing exculpatory evidence in criminal prosecutions" was sufficient to render his *Monell* claim "plausible on its face." *Id.* at 403 (internal quotations omitted). The Court noted that this specific allegation was integral to the plaintiff's success. *Id.* ("Owens has done more than [allege mere conclusions]: Owens has alleged facts . . . which, if true, would buttress his legal conclusion.").

The Fourth Circuit has repeated its admonition that to survive a motion to dismiss on a *Monell* customs theory, a plaintiff must plead "more than a municipality's adherence to an impermissible custom." *Id.* For example, in *Johnson v. Baltimore*, the plaintiff alleged that her

20

employer, the Baltimore City Police Department, discriminated and retaliated against her. 163 F.4th 808, 811 (4th Cir. 2026). The plaintiff's complaint alleged:

> It is well-known throughout the Department that [the Department] routinely suspends officers for extended periods, keeps them in the dark during false investigations, and ultimately forces them out of the Department. Black officers, in particular, have been targeted and have suffered these injustices for far too long; [The plaintiff] and her husband were not the only ones affected by this systematic mistreatment.

*Id.* at 823. The Fourth Circuit determined that despite alleging violations affecting individuals other than the plaintiff, the complaint was "insufficient to cross the plausibility threshold." *Id.* Unlike in *Owens*, where the plaintiff included specific facts to supplement their allegations, the Fourth Circuit found that the complaint "broadly reference[d] violations outside [the plaintiff's] own, [but] her allegations [were] far too general to be considered sufficient to survive the motion to dismiss stage." *Id.* The same is true here. Ms. Hardney's Complaint contains general allegations of customs or practices that affected individuals other than Mr. Sharp. But unlike in *Owens*, Ms. Hardney has not supplemented those general allegations with "specific instances . . . in support of her *Monell* claim." *Id.*

*Moody v. City of Newport News* similarly illustrates how plaintiffs asserting an "unconstitutional custom" theory under *Monell* must at least allege *some* facts supporting the existence of the custom beyond mere "labels and conclusions." 93 F. Supp. 3d at 542. There, Moody brought a § 1983 claim based on officers' alleged use of excessive force when repeatedly shooting into Moody's car, claiming that the City "maintained customs . . . amounting to deliberate indifference to the constitutional rights of Plaintiff and the public." *Id.* at 543 (internal quotations omitted). While the court found this assertion conclusory by itself, it ultimately concluded that Moody's allegation regarding a specific 2007 shooting that resulted in death, in combination with more general allegations of routine failure to investigate excessive force

21

claims, were sufficient to facially demonstrate a custom of "failing to adequately investigate excessive force claims." *Id.* at 543 (internal quotations omitted). Ms. Hardney's Complaint lacks any similar *specific* fact alleging a similar incident predating the allegations in the Complaint. Accordingly, her custom or practice theory must fail.

Ms. Hardney therefore does not allege sufficient facts to plausibly state a claim to establish *Monell* liability based on a failure to train theory. Accordingly, the Court will dismiss Count V against the City.[9]

## IV. Conclusion

For the reasons articulated above, the Court will grant the Motion. (ECF No. 9.) The Court will dismiss Counts IV and V against the City. And because Ms. Hardney agrees to dismiss the remaining Counts against the City, the Court will dismiss the City from this action.

An appropriate Order shall issue.

Date: 3/19/26
Richmond, Virginia

_____ /s/
M. Hannah Lauck
Chief United States District Judge

_____

[9] The dismissal of these claims without prejudice does not prevent Ms. Hardney from, if she discovers inadequate training as to any named officer, seeking to establish a basis that warrants discovery beyond that individual officer's conduct.

22